## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CARLTON JOHNSON, individually and on behalf of all others similarly situated, | Civ. No. _____ |
| Plaintiff, | **COLLECTIVE ACTION COMPLAINT** |
| v. | |
| TRANSPORT CORPORATION OF AMERICA, INC. and MINNWEST BANK. | |
| Defendants. | |

By and through the undersigned counsel, Plaintiff Carlton Johnson files this Collective Action Complaint against defendants Transport Corporation of America (Transport America) and Minnwest Bank (Minnwest). On his personal knowledge, and on investigation and the information and belief of his counsel, Plaintiff avers the following:

### INTRODUCTION

1. Plaintiff asserts collective action claims pursuant to the Fair Labor Standards Act (FLSA) on behalf of a class of drivers (the Leasing Drivers) who lease trucks from Minnwest Bank to operate trucks on behalf of Transport America, or its affiliates, and are contractually required to use the trucks exclusively for their work for Transport America.

2. Transport America offers long-haul ground cargo transportation services using combination tractor-trailer trucks. As part of its overall driver workforce, Transport

America retains drivers to provide long-haul cargo transportation services for its customers and/or third-party shipping brokers.

3. When its drivers do not own suitable tractor-trailer trucks, Transport America directs them to lease a truck pursuant to a Master Lease Agreement with Minnwest Bank. In conjunction with the Master Lease Agreement, Transport America further requires all such Leasing Drivers to sign an Independent Contractor Agreement purportedly classifying them as independent contractors.

4. While the Master Lease Agreement purportedly grants the Leasing Driver title to the truck, Transport America retains exclusive control over the use of the truck. By its terms, the Independent Contractor Agreement grants Transport America "exclusive possession, control and use" of the truck, and it forbids Leasing Drivers from using their trucks with other motor carriers. For these reasons, the Leasing Drivers cannot use the trucks for personal or independent business operations.

5. Transport America has the right to impose any requirements its customers may direct for the security and handling of their cargo. Because Leasing Drivers bear the risk of loss and are otherwise responsible for safeguarding cargo, they must remain on or near their trucks for the duration of all long-haul shipping jobs.

6. The Independent Contractor Agreement also requires the Leasing Drivers to bear operational expenses including, but not limited to, fuel, maintenance, insurance, and taxes. Transport America routinely deducts lease payments and operational expenses from the Leasing Drivers' regular pay statements. Because these expenses relate to tools of the trade the Leasing Drivers do not own, and because these expenses are primarily incurred

for the benefit and convenience of Transport America and not the Leasing Drivers, these deductions do not count toward the Leasing Drivers' wages under the FLSA. *See* 29 C.F.R. §§ 531.3(d)(2)(i), 531.32(c).

7. Under the economic realities of the relationship between Transport America and Minnest on one hand and the Leasing Drivers on the other, Transport America effectively controls the Leasing Drivers' work, such that Leasing Drivers are properly classified as employees under the FLSA.

8. When performing long-haul jobs for Transport America, the Leasing Drivers are on duty no later than the point in time they are waiting with the truck to load cargo. To properly safeguard the cargo in accordance with the directions from Transport America, the Leasing Drivers must remain continuously on or near the truck and its cargo until the truck is unloaded at its destination. These jobs consistently require the Leasing Drivers to remain on duty for periods exceeding 24 hours and typically stretching several days.

9. The Leasing Drivers' trucks are equipped with sleeping berths that offer them adequate sleeping facilities during the course of long-haul jobs. To properly safeguard the cargo in accordance with directions from Transport America, the Leasing Drivers must take sleep breaks in the trucks' sleeping berths. Transport America has no express or implied agreement with the Leasing Drivers regarding the timing or duration of sleep or meal breaks during long-haul jobs.

10. Because long-haul jobs require the Leasing Drivers to remain on duty for periods exceeding 24 hours and sometimes stretching several days, Transport America cannot claim more than eight hours' uncompensated sleeping and meal time each workday

under FLSA regulations. During such periods, the Leasing Drivers accrue 16 hours of work time per day. *See* 29 C.F.R. § 785.22.

11. Between their low wages—which cannot include lease payments, fuel, truck maintenance, taxes, and other expenses primarily benefiting Transport America—and their long hours, Leasing Drivers' wages routinely and consistently fall below the FLSA minimum wage of $7.25 per hour and the Minnesota minimum wage of $9.86 per hour in 2019 and $10.08 per hour in 2021.

12. Based on the foregoing, Plaintiff Carlton Johnson, individually and on behalf of the Leasing Drivers, brings this Collective Action against Transport America for violations of the Fair Labor Standards Act and seeks to recover additional wages as necessary to satisfy minimum wage, plus interest, damages, penalties, and attorney fees.

## PARTIES

13. Plaintiff Carlton Johnson is a natural person residing in Memphis, Tennessee.

14. Defendant Transport America is a Minnesota corporation with its primary place of business at 1715 Yankee Doodle Road in Eagan, Minnesota. It typically does business under the name Transport America.

15. Defendant Minnwest is a Minnesota Chartered Bank with its primary place of b usiness at 300 South Washington Street, Redwood Falls, MN 56283.

## JURISDICTION AND VENUE

16. Transport America and Minnwest conduct substantial business in this District, including but not limited to sale, management, supervision, and execution of ground freight transportation services.

17. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because a legal claim in this action arises under the laws of the United States.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Transport America and Minnwest reside in this District and a substantial part of the events and omissions giving rise to Plaintiff's claim occurred in this District.

## FACTUAL ALLEGATIONS

**A. To reduce its fleet expenses, Transport America asks drivers to lease their trucks from its affiliate Minnwest Bank. Through this arrangement, Transport America transfers its truck expenses to the Leasing Drivers, while both entities effectively maintain control and possession of the truck.**

19. Transport America offers long-haul ground cargo transportation services using combination tractor-trailer trucks. As part of its overall driver workforce, Transport America retains drivers to provide long-haul ground freight transportation services for its customers and/or third-party shipping brokers.

20. As a calculated effort to reduce its fleet costs and keep drivers off its payroll, Transport America encourages its drivers to lease trucks from Minnwest and work for Transport America as independent contractors.

21. The lease is governed by a Master Lease Agreement between Minnwest Bank as the lessor and the Leasing Driver as the lessee.

22. Minnwest Bank is not regularly engaged in the business of selling or leasing heavy tractor-trailer trucks.

23. Minnwest Bank is only involved as necessary to facilitate leases with the Leasing Drivers. Minnwest Bank and Transport American jointly administer and benefit from the Master Lease Agreement.

24. Minnwest Bank and the Leasing Drivers enter the Master Lease Agreements with the underlying expectation that the drivers will be working exclusively for Transport America and that the trucks will be used exclusively to ship cargo for Transport America customers.

25. Under supplemental documents to the Master Lease Agreement, Transport America is authorized to deduct lease payments from Leasing Drivers' pay.

26. Transport America also deducts funds, held in escrow, to be used for truck maintenance and repairs.

27. Transport America has sole discretion to approve the use of the escrowed funds to pay for such maintenance and repairs.

28. In conjunction with the Master Lease Agreements, Transport America also requires Leasing Drivers to enter Independent Contractor Agreements.

29. Under the Independent Contractor Agreements, the Leasing Drivers grant Transport America "exclusive possession, control, and use" of the leased truck. If the Independent Contractor Agreement is terminated, the Leasing Driver must return the truck to Transport America. Transport America also takes responsibility for properly marking and licensing the truck under the regulations of the Department of Transportation and Federal Motor Carrier Safety Administration.

30. Under the Independent Contractor Agreements, Transport America has the right to place its name and logo on the truck, as well as its chosen design, advertisements, and slogans. Transport America also requires Leasing Drivers to keep the truck clean at their own expense. Transport America forbids Leasing Drivers from placing any markings, signage, or messages on the truck that could be construed as "disclosing personal biases, political biases or offensive views or language."

31. Under the Independent Contractor Agreements, Transport America has the exclusive right to determine what cargo is shipped on the Leasing Drivers' trucks. While the Independent Contractor Agreements technically allow the Leasing Drivers to ship cargo for other carriers with Transport America's written permission, Transport America forbids the Leasing Drivers from doing so. Because Transport America maintains control of the Leasing Drivers' trucks and marks them with its name and logo, Transport America has no incentive to allow the trucks to be used for others' cargo shipping services. For these reasons, the Leasing Drivers cannot use the trucks for personal or independent business operations.

32. The Independent Contractor Agreement requires Leasing Drivers to pay all operating expenses, including but not limited to fuel; fuel taxes; federal highway use taxes; empty mileage; oil; tires; lubricants; garaging; repairs; labor; base plates; licenses and permits of all kinds; cab cards; detention and accessorial services; and all bridge, tunnel, ferry, road and similar tolls. Transport American furnishes Leasing Drivers with fuel cards, which Leasing Drivers may use to charge their fuel costs, but Transport American deducts these costs from Leasing Drivers' pay.

33. The Master Lease Agreement further requires Leasing Drivers to maintain insurance on the trucks. Under the Independent Contractor Agreement and its supplemental documents, Transport America specifies the exact scope of coverage required. In practice, Transport America directs Leasing Drivers to procure coverage from Transport America's preferred insurers and deducts the premiums from Leasing Drivers' pay.

34. Through the Master Lease Agreement and the Independent Contractor Agreement, Transport America maintains control and beneficial use of the Leasing Drivers' trucks, while shifting all operational expenses to the Leasing Drivers.

**B. Under the economic realities of the relationship between Transport America and the Leasing Drivers, Transport America effectively controls the Leasing Drivers' work, such that Leasing Drivers are properly classified as employees under the FLSA.**

35. While the Independent Contracting Agreement purports to classify Leasing Drivers as independent contractors, the economic realities of the relationship between Transport America and the Leasing Drivers dictate that they be classified as employees under the FLSA.

36. Transport America exercises a high degree of control over the Leasing Drivers' conduct and business operations. Transport America maintains control over the trucks and selects prospective jobs for the Leasing Drivers. It requires the Leasing Drivers to keep the trucks safe, clean, and in good repair. Transport America also forbids Leasing Drivers from engaging in conduct that reflects their personal views or biases.

37. As stated under the Independent Contractor Agreements, Transport America has the right to impose on the Leasing Drivers any requirements its customers may direct

for the security and handling of their cargo. Transport America further requires the Leasing Drivers to use its specified satellite equipment, which allows Transport America to communicate with the Leasing Drivers about jobs, track the whereabouts of the Leasing Drivers and their cargo, and monitor whether the Leasing Drivers are complying with DOT regulations. Transport America also installs cameras in truck cabs and monitors those cameras for driver compliance.

38. The Leasing Drivers make no investment that demonstrates ownership of an independent business. They do not own their trucks; they only lease them according to terms specified by Minnwest and Transport America. If at the end of the five-year Master Lease Agreement, the Leasing Drivers decide that they want to keep their trucks, they must buy them at their fair market value.

39. If the Independent Contractor Agreement is terminated for any reason, that Leasing Drivers must return their truck to Transport America.

40. Transport America operates truck terminals and provides all communications equipment. The Leasing Drivers rely on Transport America to provide facilities for truck maintenance and repair. Transport America prohibits Leasing Drivers from using third-party maintenance and repair facilities unless the facility has been previously approved by Transport America.

41. Transport America has a high degree of control over the Leasing Drivers' opportunities for profit or loss. The Leasing Drivers rely on Transport America to provide them with cargo shipping jobs. The Leasing Drivers are not involved in any discussions of

the rate or price for this work, and they cannot separately or independently negotiate rates with Transport America's customers or brokers.

42. While the Leasing Drivers' work can be difficult and grueling, it does not require professional skill or expertise. The Leasing Drivers must obtain commercial drivers licenses and maintain a clean driving record.

43. Through the Master Lease Agreements and the Independent Contractor Agreements, Transport America contemplates a longstanding, exclusive relationship with the Leasing Drivers. The Master Lease Agreement has a five-year duration, and during that time, Transport America effectively forbids Leasing Drivers from conducting independent cargo shipping operations.

44. The Leasing Drivers' work is an integral part of Transport America business operations. Long-haul over-the-road cargo shipping is major part of those operations. Transport America relies on the Leasing Drivers to ensure that it has sufficient drivers and trucks available to provide long-haul cargo shipping services to its customers and brokers.

45. Transport America has employees who perform the same long-haul cargo shipping services as Leasing Drivers.

46. With due regard for the economic realities of the relationship between Transport America and its Leasing Drivers, the Leasing Drivers lack meaningful control over their work. The Leasing Drivers do not own viable independent businesses but instead rely on Transport America for their livelihood. As a result, the Leasing Drivers are properly classified as employees under the FLSA.

10

**C.  Because Transport America requires the Leasing Drivers to bear substantial operating expenses, these expenses do not count toward the Leasing Drivers' wages. When the Leasing Drivers' wages are divided into their long hours, the result is an hourly wage that falls below the minimum required by the FLSA.**

47. Pursuant to the Master Lease Agreement and the Independent Contractor Agreement, Transport America requires the Leasing Drivers to pay numerous operational expenses including, but not limited to, fuel; fuel taxes; federal highway use taxes; empty mileage; oil; tires; lubricants; garaging; repairs; labor; base plates; licenses and permits of all kinds; cab cards; detention and accessorial services; and all bridge, tunnel, ferry, road and similar tolls.

48. Transport America routinely deducts lease payments, fuel, maintenance, insurance, and taxes from the Leasing Drivers' pay. Transport America does not make these deductions for the benefit of the drivers but for its own benefit. To the extent these deductions are used to pay for the trucks and their maintenance and operational expenses, these deductions relate to the tools of the trade. Because the Leasing Drivers have no ownership interest in the trucks, and because Transport America maintains use and control over the trucks, such deductions do not count toward the Leasing Drivers' wages under the FLSA. *See* 29 C.F.R. §§ 531.3(d)(2)(i), 531.32(c).

49. When performing long-haul jobs for Transport America, the Leasing Drivers are on duty no later than the point in time they are waiting with the truck to load cargo. To properly safeguard the cargo in accordance with the directions from Transport America, the Leasing Drivers must remain continuously on or near the truck and its cargo until the truck is unloaded at its destination. If any loss or damage occurs to the cargo while in the

Leasing Drivers' care, Transport America holds the Leasing Drivers responsible. For these reasons, during any long-haul job, the Leasing Drivers must remain on duty for periods exceeding 24 hours and typically stretching several days.

50. The Leasing Drivers' trucks are equipped with sleeping berths that offer them adequate sleeping facilities during the course of long-haul jobs. As part of their obligation to properly safeguard the cargo, the Leasing Drivers must take sleep breaks in the trucks' sleeping berths. Transport America has no express or implied agreement with the Leasing Drivers regarding the timing or duration of sleep or meal breaks during long-haul jobs.

51. Because long-haul jobs require the Leasing Drivers to remain on duty for periods exceeding 24 hours and sometimes stretching several days, Transport America cannot claim more than eight hours' uncompensated sleeping and mealtime each workday under FLSA regulations. During such periods, the Leasing Drivers accrue 16 hours of work time per day. *See* 29 C.F.R. § 785.22.

52. After excluding pay deductions not countable as wages, when the Leasing Drivers' pay is divided by their total hours, the Leasing Drivers' wages routinely and consistently fall below the FLSA minimum wage of $7.25 per hour.

53. Plaintiff Carlton Johnson signed a Master Lease Agreement with Minnwest Bank on August 3, 2020. He signed an Independent Contractor Agreement with Transport America on or around August 3, 2020.

54. Based on the economic realities of the relationship between Plaintiff and Transport America, Plaintiff is properly classified as an employee under the FLSA. For his

work for Transport America, Plaintiff must be paid no less than the FLSA minimum wage of $7.25 per hour.

55. While performing services for Transport America under the Master Lease Agreement and the Independent Contractor Agreement, his hourly wage routinely and consistently fell below $7.25 per hour. Plaintiff accordingly brings this action against Transport America for violations of the FLSA and seeks additional wages as necessary to satisfy minimum wage, plus interest, damages, penalties, and attorney fees.

## COLLECTIVE ACTION ALLEGATIONS

56. Plaintiff brings this Collective Action Complaint under the FLSA on behalf of himself and all others similarly situated. The Collective Action Members (the Leasing Drivers) are defined as follows:

> All individuals who, at any point in the three years preceding the filing of this Collective Action Complaint, worked under an Independent Contractor Agreement with Transport America and performed that work using a truck under a Master Lease Agreement with Minnwest Bank.

This definition shall be construed to encompass Leasing Drivers consistent with the practices and relationships alleged in this Collective Action Complaint. Plaintiff reserves the right to redefine the Collective Action Members prior to conditional certification.

57. Plaintiff and other Collective Action Members are similarly situated in that they have substantially similar job requirements, pay provisions, and compensation procedures, and also in that Transport America had common practices and procedures that resulted in Collective Action Members receiving less than minimum wage under the FLSA.

58. Transport America permitted Plaintiff and other Collective Action Members to work for less than minimum wage under the FLSA, and therefore, Transport America failed to properly compensate Plaintiff and other Collective Action Members for all time worked.

59. The FLSA violations asserted in this Collective Action Complaint may be brought and maintained as an opt-in collective action under 29 U.S.C. § 216(b) because Plaintiff's claims are similar to FLSA claims by Collective Action Members.

60. The precise number of Collective Action Members is unknown to Plaintiff at this time but is estimated to be hundreds of individuals. Transport America is likely to know the exact number of Collective Action Members, and it likely possesses sufficient information to facilitate notice of this action to Collective Action Members by U.S. Mail, e-mail, or other modes of communication.

## FIRST CAUSE OF ACTION
### Violation of the Fair Labor Standards Act
### Failure to Pay Minimum Wage
### (Individually and on Behalf of Collective Action Members)

61. Plaintiff incorporates by reference the allegations in the prior paragraphs of this Complaint.

62. Section 6(a) of the FLSA provides in relevant part,

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce … not less than … $7.25 an hour.

29 U.S.C. § 206(a)(1)(C).

63. Transport America engaged in uniform employment and compensation practices in its work relationships with Plaintiff and the Leasing Drivers.

64. At all times relevant to this claim, Transport America had gross operating revenues in excess of $500,000.

65. Plaintiff and the Leasing Drivers are not subject to any exemptions to minimum pay requirements under the FLSA.

66. Under the economic realities of the relationship between Transport America and its Leasing Drivers, Transport America effectively controlled its Leasing Drivers such that they are properly classified as employees.

67. By requiring Plaintiff and other Leasing Drivers to sign the Independent Contractor Agreement, Transport America knowingly and illegally misclassified Plaintiff and Collective Action Members as independent contractors instead of employees. In the Independent Contractor Agreement, Transport America misrepresented the Leasing Drivers' status to avoid paying them minimum wage.

68. Section 16(b) of the FLSA provides for mandatory liquidated damages "in an additional equal amount" to actual damages. 29 U.S.C. § 216(b).

69. Plaintiff and the Leasing Drivers demand judgment against Transport America for damages in an amount to be determined at trial plus liquidated damages, attorney fees, and any other relief provided by law.

**PRAYER FOR RELIEF**

Plaintiff Carlton Johnson prays for relief as follows:

  a. Damages in an amount to be determined at trial, including but not limited to unpaid wages and liquidated damages for Plaintiff and the Leasing Drivers pursuant to the FLSA.

  b. All relief authorized by statute or law, including but not limited to liquidated damages, civil penalties, attorney fees, and costs.

  c. Certification of collective action on behalf of the Leasing Drivers under § 16(b) of the FLSA and appointment of the undersigned counsel as counsel for the Leasing Drivers.

  d. Any other relief this Court deems just and equitable.

Dated this 16th day of April, 2021.    s/   Shawn J. Wanta
                                                Shawn J. Wanta
                                                Bar No. 0389164
                                                Scott A. Moriarity
                                                Bar No. 0321977
                                                *Attorneys for Plaintiff*
                                                BAILLON THOME JOZWIAK & WANTA LLP
                                                100 South Fifth Street, Suite 1200
                                                Minneapolis, MN 55402
                                                612-252-3570
                                                sjwanta@baillonthome.com
                                                samoriarity@baillonthome.com